JODI LINKER
Federal Public Defender
Northern District of California
JOHN PAUL REICHMUTH
Assistant Federal Public Defender
1301 Clay Street, Ste. 1350N
Oakland, CA 94612
Telephone: (510) 637-3500
Facsimile: (510) 637-3507
Email: john_reichmuth@fd.org

Counsel for Defendant Lee

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>LESTER LEE,<br>Defendant. | **Case No.:** 26–CR–003 JST<br><br>**SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE**<br><br>**Court:** Courtroom 5, 2nd Floor<br>**Hearing Date:** August 7, 2026<br>**Hearing Time:** 9:30 a.m. |

## INTRODUCTION

Lester Lee comes before the Court to be sentenced for violation of 18 U.S.C. § 876, making threats through the mail, and requests a sentence of Time-Served, followed by three years of Supervised Release, to include the condition that he serve 12 months of Home Confinement as a condition of that Supervised Release. That would be sufficient, but not greater than necessary, to comply with the sentencing goals set forth in 18 U.S.C. § 3553: Mr. Lee is a 70-year-old man with significant mental and physical health conditions, including PTSD and a history of heart disease and diabetes.

An African American who himself still carries deep emotional scars from institutional racism as a youth, he issued frightening and demeaning threats against African American students at a school where he had been a teacher. He does not claim that these acts were justified or insignificant, or that the fear, disruption, and pain that they caused were not very real. He is deeply sorry for the community and individual harm his behavior caused, recognition of which has come through a mental health treatment process afforded to him by this Court which he has embraced.

The parties and the Probation Officer agree on the guidelines in this case, a Total Offense Level of 13 and a Criminal History Category I, yielding an advisory sentencing range of 12 to 18 months imprisonment. The parties and the Probation Officer jointly recommend the proposed sentence in this extremely unique case. Mr. Lee lives with physical and mental health challenges, and the disposition here helps address them directly while also imposing restitution, a felony sanction, and a significant restriction of liberty as a reflection of the seriousness of the offense.

## SENTENCING RECOMMENDATION

Criminal "punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). That requires "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996) (quotations omitted)). Ultimately, the "overarching statutory charge for a district court is to 'impose a sentence sufficient but not greater than necessary'" to reflect the factors detailed in 18 U.S.C. § 3553(a). *United States v. Carty*, 520

F.3d 984, 991 (9th Cir. 2008) (en banc) (quoting 18 U.S.C. § 3553(a)). The § 3553(a) factors assist the Court in fulfilling its mandate to make "an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime." *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985).

Against this backdrop, the Court must identify the *least amount of time necessary* to satisfy the objectives outlined in 18 U.S.C. § 3553(a). To be clear, every day of prison must be necessary under federal law. A substantively reasonable sentence, accordingly, will balance the need for deterrence and punishment against the circumstances that shaped Mr. Lee's life. He does not suggest that his life experiences in any way excuse his actions, but they do provide an appropriate framework within which the Court may determine what sentence is sufficient, but not greater than that necessary, to meet § 3553(a)'s criteria. A felony conviction, with restitution, treatment, and lengthy home confinement, as recommended by the parties and the Probation Office, is fair, practical, and good for the community. This is true in large part because it acknowledges the complexity of this case:

Mr. Lee is the product of some extremely damaging experiences as a youth. Though he arguably has an Adverse Childhood Experiences (ACEs) score of 1 out of 10, (PSR ¶ 58), he experienced a number of things that, though they may not count explicitly, were analogous to, or even potentially worse than, some ACEs: physical bullying, explicit racism, corporal punishment, and a lack of security and a sexual predator who made him feel uncomfortable at his school. Indeed, science is now recognizing the damage caused by "expanded ACEs,"[1] which include trauma outside the home, such as bullying, community violence, and racism. It was these expanded ACEs that likely produced such damage in Mr. Lee throughout his life and led to his Post-Traumatic Stress Disorder. PSR ¶ 57. Though his parents worked to provide for him and his siblings, he appears to have been severely affected by his childhood traumas, and both his physical and mental health are consistent with that.

Most notably, Mr. Lee lived through a time as a child when there was explicit racism, such as "whites only" signs in his community. PSR ¶ 50. The social science demonstrating the caustic effects

[1] Cronholm PF, Forke CM, Wade R, et al. Adverse childhood experiences: expanding the concept of adversity. Am J Prev Med. 2015;49(3):354–361.

of explicit racism on children was recognized in 1954 in *Brown v. Board of Ed.*: "To separate [African American children] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone" 347 U.S. 483, 494 (1954). Explicit racism most certainly has had lasting effects on Mr. Lee.

At the same time as experiencing explicit racism, Mr. Lee endured unsafe and violent schools in the turbulent Bay Area of the early 1970's. He was in high school in Alameda until 1973. PSR ¶ 60. There he did not feel remotely safe; he was bullied and "picked on" and had to fight, leading to his own placement in a "paddy wagon." PSR ¶ 49. As Jeffrey Toobin notes in *American Heiress*, a history of the Patricia Hearst kidnapping, many have forgotten how violent the early 1970's were, especially in the Bay Area.[2] Toobin notes 1,955 bombings in the U.S. in 1973 and random race-based killings of Caucasians, including 4 people in San Francisco on a single night in January 1974, the week before the kidnaping of Patricia Hearst, by a group called the Death Angels. The schools were not havens from this chaos; quite to the contrary, they were exactly as Mr. Lee recalls them: violent and dangerous centers of social problems, racial tensions, protest, and political conflict. The Superintendent of Oakland Schools, Dr. Marcus A. Foster, was assassinated on November 6, 1973.[3] A local reporter, referring to a 1973 Grand Jury report also cited by Toobin, notes:

> In 1973, an Alameda County grand jury investigating the district released a scathing report on violence and vandalism in Oakland schools, which put more pressure on district officials to address their disciplinary policies. According to a July 1973 article in the *Berkeley Daily Gazette,* the report tallied 29 attacks on school personnel, three robberies, and seven assaults on campuses, plus more than $300,000 in fire damage in 1972, largely caused by students. Ashley McBride, *How Oakland Unified School District got its own police force*, Oaklandside, June 23, 2020.[4]

Though these records pertain to Oakland, Mr. Lee's recollections of dangerous schools in Alameda appear to be consistent with the historical record. He faced institutional racism on one hand

[2] Jeffrey Toobin, American Heiress, 2016 at 13-16 (noting 1955 bombings in the US in 1973, the Zociac Killer, and random killings of Caucasians, including 4 people in San Francisco the week before the kidnaping of Patricia Hearst, by a group called the Death Angels).

[3] Eric Caldwell, *Veteran Is Charged in Killing of Oakland Educator*, NEW YORK TIMES (Jan 12, 1974).

[4] Jeffrey Toobin notes that the 1973 Grand Jury report had put the number of assaults at 42, with one murder on school property and $1 million in damages. Jeffrey Toobin, American Heiress, 2016 at 43.

and interpersonal violence at school on the other. His poor mental and physical health are very likely tied directly to these damaging influences. In one study, someone who faced four ACEs was "460 percent more likely to suffer from depression than someone with an ACE score of 0" and "an ACE score greater than or equal to 6 shortened an individual's lifespan by almost 20 years."[5] Not only have these experiences been debilitating in general, Mr. Lee directly ties them to his behavior in this case, and this is not self-serving. On the contrary, it makes much more sense out of the odd circumstances here, in which an African American who had been humiliated by racial slurs as a child suddenly started using them against students in schools that reminded him of his childhood. He notes: "I didn't know my problem was this deep. I am triggered by bad schools." PSR ¶ 57.

It is often repeated by courts, prosecutors and others that childhood trauma is not an excuse for an adult's behavior. Some courts have dismissed years of neglect and abuse inflicted upon a defendant as a child, arguing that a grown man has had plenty of time to decide what type of adult he should be. But childhood trauma does not have an expiration date or a schedule. Indeed, trauma is a major factor "that shapes . . . criminal behavior in adulthood." Burch, Audra, *A Gun to His Head as a Child. In Prison as an Adult.*, NEW YORK TIMES (October 15, 2017). One commentator explains,

> [I]n a justice system built upon the idea of choice and personal responsibility, experts say the path to trouble may begin long before an individual has any say in the matter. What happens to people in childhood can make a difference in whether they end up in a prison cell, or whether they are even wired to make rational decisions.

*Id*. It is a "huge factor within the criminal justice system." *Id*. Nor does the manifestation of childhood trauma necessarily announce itself gradually. Here, though Mr. Lee's physical deterioration has been chronic, he had not been convicted of a crime in 67 years, but he suffered a sudden mental health crisis:

> He related that, with regard to the 2023 instant offense conduct, he had felt triggered related to his own childhood experiences with fellow peers he described as bullies/thugs. The defendant shared he felt as if he had experienced a "mental breakdown" during the aforementioned period, which influenced his involvement in the instant offense conduct. PSR ¶ 56.

[5] Felitti VJ. The Relation Between Adverse Childhood Experiences and Adult Health: Turning Gold into Lead. Perm J. 2002 Winter;6(1):44-47. doi: 10.7812/TPP/02.994. PMID: 30313011; PMCID: PMC6220625.

This case is very much about childhood trauma, that suffered by Mr. Lee, and that perpetuated by him on others.

This prosecution has also been good for both Mr. Lee and the community. He continues to benefit from and welcome mental health counseling. He is not in the school system and will remain out of it. He receives treatment for numerous health problems that are much better addressed out of custody, rather than in an overtaxed BOP healthcare system. He complies with his supervision, proving that the sentencing factors of community protection, specific deterrence, and rehabilitation can be fulfilled by community confinement. The requested sentence will also be good for Mr. Lee and the community. The government is correct in its assessment of this unique case: the joint recommendation of the parties and Probation Officer is appropriate.

CONCLUSION

Based on the foregoing, Mr. Lee respectfully requests that he be sentenced to three years of supervised release with a one-year home detention condition and restitution.

Dated: July 31, 2026

Respectfully submitted,

JODI LINKER
Federal Public Defender
Northern District of California

/S

JOHN PAUL REICHMUTH
Assistant Federal Public Defender